**SO ORDERED.**

**SIGNED this 25 day of January, 2011.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| HP DISTRIBUTION, LLP., | ) | Case No. 09-12310 |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Joint Administration |
| IN RE: | ) | |
| | ) | |
| HITCHIN POST STEAK CO., | ) | Case No. 09-12308 |
| | ) | Chapter 11 |
| Debtor. | ) | |

### MEMORANDUM OPINION

This matter came on for trial on creditor Teletrac, Inc.'s ("Teletrac") Motion to Compel Assumption or Rejection of Executory Contracts pursuant to 11 U.S.C. § 365(d)(2), specifically certain airtime service agreements related to 82 GPS units that debtor HP Distribution, L.L.P.

1

("HP") utilizes to track its trucks in its transportation operations.[1] HP disputes the monthly charge for the airtime services and the amount of the arrearage.

Jurisdiction

This is a core proceeding over which this Court has subject matter jurisdiction.[2]

Factual Background

This matter came on for evidentiary hearing on September 15, 2010.[3] At issue here are three leases of GPS truck tracking equipment and agreements to acquire airtime for those devices. Each agreement refers to airtime charges as being "included" in the monthly equipment lease payment.[4] In one instance, the airtime charges are also shown as "$0.00."[5] Debtor and Teletrac agree that, at least as to the GPS units or equipment, the agreements are truly disguised sales and not leases. Where they disagree is whether that part of the agreements relating to airtime is executory, and if executory, the manner in which the cure would be calculated and the proper ongoing airtime rate. HP and Teletrac have agreed that, as to the equipment, HP will retain it and pay Teletrac its value plus interest over the plan's life. Because HP is surrendering some of its rolling stock to lessors, it intends to return some of the units to Teletrac.[6] What remains in dispute is upon what terms the

---

[1] Dkt. 285.

[2] 28 U.S.C. § 157(b)(1), § 157(b)(2)(A) and (B), and § 1334(b).

[3] Teletrac appeared by its attorney Nicholas Grillet. HP appeared by its attorney Mark Lazzo.

[4] Ex. T1, T2, T3.

[5] Ex. T1.

[6] HP's general manager Craig Cunningham testified that HP intends to retain 50 of the 82 GPS units and pay $500 per unit or $25,000. The 32 units that HP intends to reject are units covered by Agreements marked Exhibit T2 and T3 (part of the 16 and 25 unit Agreements).

debtor must assume or reject that part of the agreement that pertains to air service.

HP entered into three Equipment and Subscriber Agreements for the lease of 82 GPS units and air service for a 36 month term.[7] One Agreement (Lease 82753) dated July 2, 2008 was for 41 GPS units, related equipment and software and airtime services for the 41 units.[8] The unit price is shown as $70 for an equipment subtotal of $2,870 per month and a monthly total of $5,740.[9] The Agreement describes airtime for 41 units as "Airtime INC" at a monthly rate of $0.00. Attached to this Agreement, is a document entitled "Lease Agreement."[10] This document describes the Equipment being leased as "41 TM2 units with Jbus." The "End of Lease" box is marked, indicating that HP will purchase for $1.00: "At Lease end, provided Lessee has complied with all Lease requirements, Lessee may purchase "all or none" of the *Equipment* . . . on an "as-is, what is, where-is" basis . . . ." This Lease Agreement makes no reference to "airtime."

A second Agreement (Lease 68036) dated June 12, 2007 was for 16 GPS units, related

---

[7] Ex. T1, T2, T3.

[8] Ex. T1.

[9] 41 units x $70 = $2,870. This Agreement is the only one of the three Agreements that breaks down the equipment monthly rate and a total monthly rate. It is not apparent from the face of the Agreement to what the difference is attributed. The Court observes that the monthly total in Ex. T1 is exactly two times the equipment monthly rental amount. After examining the Agreements represented by T2 and T3, it appears that two months' rent was paid up front with the remaining 34 months being paid monthly at the equipment monthly price. *Cf.* Ex. T2 and T3. The Court thus concludes that the "Monthly Total" of $5,740 referenced in Ex. T1, is the first two months' rent paid up front with the regular monthly payment of $2,870 being paid over the next 34 months. The second page of Ex. T1 identifies the $5,740 figure as "advanced rent(s)," and supports this interpretation.

[10] *See* Ex. T1, p. 2. The Lease Agreement furnished to the Court appears to be incomplete and missing a second page or terms on the reverse side of the Lease Agreement.

3

equipment and software, and airtime service.[11] This Agreement reflects a unit price of $71 and that airtime for the 16 units is included in the total monthly rent of $1,136.[12] The "Lease" attached to this Agreement also contains a $1.00 purchase option for the described equipment, again with no mention of airtime.[13]

The third Agreement (Lease 58799) dated September 18, 2006 was for 25 units, related equipment and software, and airtime for the 25 units.[14] This Agreement indicates a unit price of $78.91 and that airtime is included in the total monthly rate of $1,972.75.[15] The third Agreement contains an attached "Lease" similar to the second Agreement and contains a $1.00 purchase option for the described equipment.[16]

Each Agreement has an attached Terms and Conditions that are incorporated into and made a part of the Agreement. The Terms and Conditions are similar, but not identical, for each Agreement. The four-page Terms and Conditions, with twenty numbered paragraphs, attached to Ex. T1 and Ex. T3 appear to be substantially the same. These Terms and Conditions are identified at the bottom of the page as "v.0805 Rev. 2/08." They reference Teletrac's "FleetDirect™

---

[11] Ex. T2.

[12] 16 units x $71 = $1,136.

[13] Ex. T2, p.2. This Lease is largely illegible.

[14] Ex. T3.

[15] 25 units x $78.91 = $1,972.75. Ms. Rodriguez of Main Street Bank testified that the total lease amount of $71,019 was lowered to $63,900 by virtue of a replacement order. *See* Ex. T6 and T7. The unit price was lowered to $71 [$63,900 ÷ 25 = $2,556 per unit; $2,556 ÷ 36 months = $71 per unit per month or $1,775 per month rent for 25 units (25 units x $71)]. *See* Ex. 43, pp. 14-15.

[16] Ex. T3, p. 2. This Lease likewise appears to be incomplete and mostly illegible.

4

Software."[17]  Paragraph 19 provides that the Agreements marked Ex. T1 and T3 are governed by California law.  In paragraph 18 of the Terms and Conditions, it states that "[a]irtime charges for Services are billed in advance, at the beginning of each period, based on the Customer's selected Plan, *as set forth in the Agreement.*"[18]  Under these Terms and Conditions, upon expiration of the Agreement's three year term, the Agreement automatically renews for one year in the absence of timely notice by the customer.  The customer is obligated to pay Teletrac "the aggregate price and fees for all Products, Services and Software listed in the Agreement for term of contract in effect if Customer cancels contract before contract expiration."[19]  The Terms and Conditions contain an integration clause.[20]

The Terms and Conditions attached to the Agreement marked Ex. T2 differ slightly.  They are marked at the bottom of the last page as "v.0107."  Different software is identified in these Terms and Conditions.[21]  These Terms and Conditions are the same as those previously described to the extent that Agreement marked Exhibit T2 is also governed by California law and the language in paragraph 18 contains the same statement regarding airtime charges.  In these Terms and Conditions, the Agreement automatically renews on a month-to-month basis and is terminable by 30 day written notice prior to the end of a monthly period.[22]  Exhibit T2's Terms and Conditions

---

[17]  Ex. T1 and T3, Terms and Conditions ¶ 1.

[18]  Ex. T1 and T3, Terms and Conditions ¶ 18.

[19]  Ex. T1 and T3, Terms and Conditions ¶ 13.

[20]  Ex. T1 and T3, Terms and Conditions ¶ 19.

[21]  Ex. T2, Terms and Conditions ¶ 1 describes the software as "Teletrac's eClient Software."

[22]  Ex. T2, Terms and Conditions ¶ 13.

also contain an integration clause.[23]

The Agreements were finance leases and the financiers and servicers were Key Equipment Finance and Main Street National Bank; Teletrac repurchased the leases and servicing rights pursuant to vendor recourse agreements. According to Teletrac's proof of claim filed in this case,[24] Lease 82753 had unpaid rentals of $67,024 at a monthly payment of $2,870. Lease 68036 had unpaid rentals of $14,808 at a monthly payment of $1,234. Lease 58799 had unpaid rentals of $19,281 at a monthly payment of $1,928. This unpaid amount includes both prospective airtime charges and equipment expense over the life of the lease as well as any arrearage. At the time of filing, July 21, 2009, only $2,870 was in arrears.[25] The total outstanding balance on these agreements is $101,114.22.

During the September evidentiary hearing, the Court received live testimony of HP's representative Craig Cunningham, and deposition testimony of three representatives of Key Equipment Finance, Main Street National Bank, and Teletrac, respectively.[26] Mr. Cunningham acknowledged that he was authorized to sign the Agreements in questions and that HP received airtime service once the GPS devices were installed in its truck fleet. He testified that HP experienced an interruption in airtime service and technical support from August 2009 through January 2010. HP could not access or retrieve any data on Teletrac's server during this period. Airtime service did resume in February 2010. Mr. Cunningham believed that at the end of the 36

---

[23] Ex. T2, Terms and Conditions ¶ 19.

[24] Proof of Claim No. 25.

[25] This figure is the equivalent of one month's rent under Agreement/Lease 82753.

[26] Ex. 42, 43, and 44.

6

month term, HP would obtain the GPS units for the $1.00 purchase option and continue to receive airtime without charge.

Teletrac presented the testimony of Nancy Barnes who is the litigation coordinator for Key Equipment Finance with respect to its recourse portfolio. She testified about Key Bank being the lender for the acquisition by Teletrac of the GPS units covered by Agreement 82753 (41 units) and the biller for Teletrac's services. When HP filed this case, Key resold the paper to Teletrac under its recourse agreement. Ms. Barnes noted that Teletrac's agreement with HP provided for the airtime charges to be "included," but could not break them out from the charges pertaining to the equipment. No one asked her how much Key Bank lent into the transaction.

Michele Rodriguez is the recovery representative or account manager for the bankruptcy and litigation portfolios for Main Street Bank. She testified about MSB's funding of Agreements 58799 (25 GPS units) and 68306 (16 GPS units). In connection with these leases, MSB loaned Teletrac an amount equal to the total of the lease payments contemplated on Exhibits T2 and T3, plus a lease factor or prepaid interest charge of 12.5%, minus the downpayment – two months' advance rent.[27] Ms. Rodriguez testified that after the bankruptcy case was filed, Teletrac billed HP $47 per month per unit in airtime charges, but could not articulate what the source of that charge was.[28] She noted that while MSB was billing the debtor, airtime was not broken out on the invoices.

The most helpful testimony comes from the deposition of Patricia Villareal, Teletrac's collections supervisor and corporate representative. Ms. Villareal's testimony clarifies that after HP's bankruptcy filing, Teletrac opted to purchase the equipment that had been installed in HP

---

[27] *See* Ex. T29 and T30.

[28] Ex. T18 and T19.

trucks at what she described as a "depreciated value." In her testimony, she identified and discussed Exhibit T26, Teletrac's cash price list which sets out the "a' la carte" pricing for both equipment and airtime sold by Teletrac. While Exhibit T26 is dated July of 2009, Ms. Villareal stated that the airtime rate of $47 per unit per month had not changed. She stated that equipment prices may have increased somewhat since HP entered into these Agreements in 2006, 2007, and 2008. She testified that the prices indicated on the three HP Equipment and Subscriber Agreements are "bundled" – in other words, they include not only the equipment that Teletrac supplies, but also the cost of resold air-time that Teletrac obtains from ATT and resells to its customers. She testified that the $47 airtime rate enables Teletrac to make a slight profit. Without prices for the equipment that match the dates of the Agreements, she could not break out the cost of the equipment from the airtime, but her credible testimony is the airtime costs $47 per unit and that the airtime charge is included in the pricing of the overall agreement.

Analysis

11 U.S.C. § 365(d)(2) provides, in relevant part:

> In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease . . . of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such a contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

Subsections 365(b)(1)(A) and (C) require that prior to assuming an executory contract or unexpired lease of personal property, debtor must cure or provide adequate assurance that it will promptly cure a monetary default and provide adequate assurance of future performance under the contract or lease.

The subject Equipment and Subscriber Agreements are executory contracts and subject to

8

the rules and law regarding contract interpretation.[29] The Court applies California law to the Agreements.

The Court must first determine whether the Agreements are ambiguous as it pertains to airtime service. Language in a contract is ambiguous if it is reasonably susceptible to more than one interpretation.[30] Each of the Agreements refers to airtime as "included," and in one instance lists the monthly rate as "$0.00." The Agreements may be interpreted in two ways: either airtime is "free" or the cost of the airtime is "included" in the total cost of the equipment and its use to HP. Because of these alternative interpretations, the Court is free to look to other evidence that may aid it in explaining and interpreting the parties' agreement.[31] Accordingly, the Court overrules HP's

---

[29] *Villacres v. ABM Industries Inc.,* 189 Cal. App. 4th 562, 598, 117 Cal. Rptr. 3d 398 (2010) ("Interpretation of a contract, including resolution of any ambiguity, is solely a judicial function. [citation omitted] The primary goal of contract interpretation is to give effect to the mutual intent of the parties. [citation omitted] The intent is to be determined solely from the written provisions of the contract if possible . . . but also considering 'the circumstances under which the contract was made and the matter to which it relates.' [citations omitted].")

[30] *Abers v. Rounsavell,* 189 Cal. App. 4th 348, 356, 116 Cal. Rptr. 3d 860 (2010) (interpreting language "leased land" in a condominium single-unit ground lease). Under California law, the trial court may take a "preliminary look" at proffered extrinsic evidence to determine ambiguity. *Id. See also, Singh v. Southland Stone, U.S.A., Inc.,* 186 Cal App. 4th 338, 112 Cal. Rptr. 3d 455 (2010) (If the writing intended by the parties as a final expression of their agreement is ambiguous, extrinsic evidence of the parties' intention is admissible, provided that the writing is reasonably susceptible of the meaning supported by the extrinsic evidence.).

[31] Parol evidence may not be used to vary or contradict an integrated instrument's express terms; even if the contract is not integrated, extrinsic evidence cannot be used to contradict the contract's terms unless the language is reasonably susceptible to the proposed interpretation. *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC,* 185 Cal. App. 4th 1050, 111 Cal. Rptr. 3d 173 (2010) (concluding that termination provision in lease for landlord-developed retail store was not ambiguous). The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.,* 176 Cal. App. 4th 697, 97 Cal. Rptr. 3d 856 (2009).

objection to admission of parol evidence and admits not only the Agreements, but also Exhibits T4 through T41 inclusive. Similarly, the Court overrules HP's objection to the testimony of the three deposition witnesses as it relates to the meaning of the Agreements. In so ruling, the Court concludes that none of the disputed evidence was offered to refute or contradict the Agreements, but merely to aid in their interpretation and that it reasonably supports and explains Teletrac's proposed interpretation.[32]

The repeated reference that the airtime is included in the listed price and that equipment is described to obtain airtime service, strongly suggests that the "incl" notation means exactly that. That is to say, airtime charges are included, or a part of, the quoted monthly price.[33] The Court believes that the plain language employed in the Agreements supports Teletrac's interpretation. HP certainly has come forward with no extrinsic evidence supporting its interpretation that the airtime service was intended to be "free" or at no cost.[34] Indeed, the prefatory language in the "AIRTIME AND SERVICES" section of the Agreement states: "The undersigned hereby requests, and agrees to pay for location and data communication services provided by Teletrac in accordance with the rates stated below. Monthly billing for airtime and services shall commence at time of installation . . . ."[35]

---

[32] *See Huverserian v. Catalina Scuba Luv, Inc.,* 184 Cal. App. 4th 1462, 110 Cal. Rptr. 3d 112 (2010) (Interpreting an exculpatory provision in scuba equipment rental agreement and concluding that it was unambiguous and limited to boat dives or multiple day rentals).

[33] "Include" is defined: "[t]o contain as a part of something. Black's Law Dictionary (9th ed. 2009).

[34] Black's Law Dictionary defines "free" as "[c]osting nothing; gratuitous." Black's Law Dictionary (9th ed. 2009).

[35] *See* Ex. T1.

A comparison of the Equipment and Subscriber Agreements to the "Lease" document attached is also revealing. The three Lease documents all provide for a $1.00 purchase option for the "Equipment" described at the end of the 36 month term. Unlike the Equipment and Subscriber Agreeement, the "Lease" document makes no mention of airtime, nor the location and data wireless communication services referenced in the Agreement. Indeed the Terms and Conditions provide for automatic renewal of the 36 month term in the Agreement, not a purchase option, and clearly contemplate that the customer would continue to pay a fee for the ancillary services in using the GPS equipment until the Agreement was terminated. In short, HP's interpretation that when it acquired the equipment at the end of the lease term for $1.00 the airtime was included, is simply not supported when all of these agreements and documents are considered together.

Moreover, a review of the Agreements, which are substantially the same, and the Teletrac price list demonstrates that the prices agreed to by the parties on the agreements includes not only the cost of the equipment, but also the bundled service charges for airtime. Per Teletrac's price list, if the GPS units acquired by the debtors have a unit cost of $815 and the Jbus devices to connect them to Teletrac's server cost $250, the total equipment cost per unit is (at least in 2009) $1,065.[36] Airtime service for each unit costs $47 per month. Consider Agreement 82753 that covers 41 units and apply the above price list figures. The acquisition cost of the 41 units is $43,665 (41 x $1,065). Air service for 41 units over 36 months at $47 per month totals $69,372. The total contract cost would therefore be $113,037 ($43,665 equipment + $69,372 airtime). Divided by 36, the monthly payment per unit is approximately $76 of which $47 accounts for airtime. Because there was no

---

[36] *See* Ex. T26. The Court observes that this equipment cost is considerably less than that listed on the Agreements, lending support for the interpretation that additional costs such as airtime service were included in the "equipment cost" figure.

11

evidence of the equipment prices as of the date of the three Agreements, the Court cannot calculate a similar breakdown for the actual leases before it today, but it can conclude that the cost of the GPS equipment is only a part of what Teletrac charged for in the three Agreements and that the monthly payment includes an airtime service charge of $47. Comparing this to actual Agreement 82753, Teletrac agreed to supply 41 units at $70 per unit per month. This yields rents of $2,870 per month. Over 36 months, the total contract cost is $103,320. Subtracting the value of air service for 36 months, $69,372, leaves $33,948 for equipment – $828 per unit. The Court is convinced that the lion's share of the charges under the three Agreements constitutes airtime.

Finally, this interpretation is supported by the language in the Terms and Conditions incorporated as part of the Agreements. Each set of Terms and Conditions clearly contemplates an Agreement pertaining to more than a lease or sale of GPS units. The Agreements themselves are termed "Commercial Equipment *and Subscriber Agreement*." The definitions used in the Terms and Conditions refer to three components: wireless network equipment, software, and "location and data communication services."[37] If airtime services were "free" there would be no reason to identify airtime in the Agreement or the communication services or service plan to be provided to the customer by means of Teletrac's software and a wireless service provider. Under California law, the court must interpret the contract by reference to the circumstances under which it was made, and the matter to which it relates.[38] HP's interpretation runs counter to this rule of contract interpretation. The Court simply cannot accept that airtime service was intended to be free where the Terms and

---

[37] Ex. T1

[38] *DVD Copy Control Ass'n, Inc., supra* at 869, citing California's statutory rule of interpreting contracts, West's Ann. Cal. Civ. Code § 1647.

12

Conditions are replete with provisions pertaining to the location and data communication services being provided by Teletrac through a third party wireless service carrier. The Court therefore concludes that HP is obligated under the three Equipment and Subscriber Agreements for airtime service charges at the rate of $47 per unit per month.

The evidence shows that HP has made no payments of any kind since the case was filed. HP's general manager, Craig Cunningham testified that airtime service and technical support was cut off from August 2009 through January 2010 and did not resume until February 2010. Teletrac does not dispute this alleged service interruption. Accordingly, the Court finds that no airtime service charges have been paid by HP since July of 2009 (HP was current with the exception of one payment of $2,870 at commencement). In order for HP to assume the airtime service agreements, it must cure by paying the pre- and post-petition arrearage of 8 months airtime (February 2010 - September 2010) for all 82 units and adequately assure Teletrac and the Court that it can continue to make the remaining payments due.[39] These three Agreements were signed in 2006, 2007 and 2008 and their base terms have expired or will shortly. The Agreements automatically renew and HP continues to use the airtime services. Airtime due through September of 2010 is $30,832 (8 months x 82 units x $47).

Pursuant to § 365(d)(2) HP shall therefore assume or reject the airtime service portion of these Agreements not later than 21 days from the date of this order and in accordance with § 365(b)(1) cure the airtime charge arrearage set out above or provide adequate assurance to Teletrac

---

[39] 11 U.S.C. § 365(b)(1)(A) and (C).

that it can promptly effect that cure.[40]  Teletrac's motion is therefore GRANTED.

# # #

---

[40] The Court notes that in November of 2010, Teletrac filed a motion for partial relief from the automatic stay (Dkt. 444) with respect to the GPS units and a stipulated order granting Teletrac partial relief was entered November 18, 2010 (Dkt. 446). Pursuant to that stipulated order, 32 of the 82 units are to be returned by HP and made available to Teletrac in a timely fashion. It is not apparent from the order whether that has occurred and if so, the date of the return. Once these 32 units are returned, HP will not be obligated for airtime charges with respect to these 32 units going forward. HP does remain obligated for the airtime charges on these 32 units at the rate of $47 per unit per month up to the date of their return and remains obligated for the $47 monthly airtime charge on each of the remaining 50 GPS units HP retains in its possession.